**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KYLE M. DENHAM,**

      **Plaintiff,**

                                    **Civil Action 2:15-cv-2425**

     **v.**                            **Judge James L. Graham**

                                      **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Kyle M. Denham, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 10). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed his applications for benefits on January 31, 2013, alleging that he has been disabled since October 5, 2012, due to depression, bipolar disorder, and paranoia. (R. at 327-32,

333-34, 355.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Karl Alexander ("ALJ") held a video hearing on October 1, 2014, at which Plaintiff, represented by counsel, appeared and testified. (R. at 178-94.) Larry Ostrowski, Ph.D., a vocational expert, also appeared and testified at the hearing. (R. at 194–200.) On October 31, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 155-68.) On April 23, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.) Plaintiff then timely commenced the instant action.

In his Statement of Errors, Plaintiff raises a single issue. Plaintiff asserts that the ALJ's formulation of Plaintiff's mental residual functional capacity ("RFC") is not supported by substantial evidence because it resulted from a significant legal error. More specifically, Plaintiff maintains that the ALJ's refusal to accord weight to the opinion of Nurse Practitioner Marsha Lewis ("N.P. Lewis") on the grounds that she was not an acceptable medical source violates Social Security Ruling 06-3p. Plaintiff submits that this error is not harmless because the (1) ALJ found N.P. Lewis' opinion to be "quite reliable and consistent with other objective medical evidence in the record," (R. at 166); and (2) the limitations N.P. Lewis opined, if incorporated into the RFC, would have resulted in a finding of disability.

In her Memorandum in Opposition, the Commissioner counters that the ALJ reasonably weighed the opinion of N.P. Lewis. The Commissioner alternatively argues that "even if the ALJ erred in rejecting [N.P. Lewis'] opinion because she was an 'other' source, any error should be deemed harmless." (Comm'r's Mem. in Opp. 7, ECF No. 18.) In support of this assertion,

the Commissioner first asserts that "any error was harmless because [N.P. Lewis'] opinion was not entitled to any special deference because she was not a treating physician." (*Id*. at 8.) The Commissioner explains that because the protections of the treating-physician doctrine do not apply, "the ALJ was entitled to discount the opinion of [N.P. Lewis]." (*Id*.) The Commissioner next asserts that any error is "harmless because the ALJ did not ignore or discard [N.P. Lewis'] findings." (*Id*.) According to the Commissioner, "the ALJ, to a large extent, adopted [N.P. Lewis'] opinion of moderate limitations" because he found that "Plaintiff had moderate limitations in all of the 'B criteria' . . . . (*Id*.) The Commissioner concludes that because the "the ALJ's decision was . . . consistent with, and incorporated [N.P. Lewis'] opinion that Plaintiff had moderate symptoms" . . . any error should be found harmless. (*Id*. at 8–9.) Third, the Commissioner asserts any error is harmless because [N.P. Lewis] only opined moderate mental limitations, which is not consistent with a disability finding. Fourth, the ALJ maintains that "any error should be found harmless because substantial evidence supported the ALJ's assessment of Plaintiff's mental impairments and residual functional capacity." (*Id*. at 10.) In support of this assertion, the Commissioner refers to Plaintiff's treatment notes and record of compliance with medical treatment. Fifth and finally, the Commissioner contends that "any error should be found harmless because [N.P. Lewis] provided no objective basis for her opinion." (*Id*. at 12.) The Commissioner instead points out that the form consisted only of checkmark responses, with no supporting objective and clinical findings. The Commissioner further notes that N.P. Lewis did not even complete the forms and that instead, Plaintiff filled out the forms with an individual named Jo Copeland and that the forms were subsequently forwarded N.P. Lewis for review and signature.

3

In his Reply, Plaintiff asserts that the Court should reject the Commissioner's assertion that the ALJ's erroneous evaluation of N.P. Lewis' opinion is harmless.  Plaintiff maintains that the Commissioner's first basis for asserting any error is harmless is irrelevant because she is not arguing that the ALJ should have applied the treating-physician rule.  Plaintiff submits that the next basis the Commissioner advanced in support of her contention that any error is harmless is invalid because the vocational expert ("VE") testified that an individual limited in the way N.P. Lewis opined would be unable to sustain competitive employment.  Plaintiff next asserts that the Commissioner's reliance upon authority reflecting that moderate mental health impairments are not consistent with a disability finding is misplaced in light of the VE's testimony that Plaintiff's moderate impairments are work preclusive if the word "moderate" is construed as it is on the form N.P. Lewis signed.  Finally, Plaintiff asserts that this Court must reject Plaintiff's assertion that N.P. Lewis lacked an objective basis for her opinions because "[a]ny argument of this nature constitutes *post hoc* rationalization."  (Pl.'s Statement of Errors 4, ECF No. 19.)  Plaintiff further submits that the ALJ's own statements that N.P. Lewis' opinions are consistent with the objective medical evidence refutes any argument of this nature.

## II.    RELEVANT RECORD EVIDENCE[1]

### A.    Treatment at Southeast, Inc.

Plaintiff initially presented to Southeast, Inc., seeking mental health treatment on February 11, 2013.  (R. at 432-36.)  Plaintiff acknowledged a history of alcohol abuse and use of

---

[1]The Undersigned limits discussion to evidence bearing on the sole contention of error Plaintiff raises in his Statement of Errors.  (ECF No. 13.)

marijuana, cocaine, and acid.  He reported that the medication Seroquel, prescribed by the hospital,  makes him feel "very drugged out."  (R. at 432.)  On mental status examination, Plaintiff displayed appropriate appearance.  He was oriented to person, place, time, and situation.  His behavior was unremarkable.  Plaintiff's affect was found to be flat, and his mood was irritable and depressed.  His short-term memory was impaired, but his sensorium was clear consciousness.  Plaintiff's intellect was average, and his attitude was cooperative.  His attention was maintained.  Plaintiff's reasoning, impulse, and judgment were all good.  His self-perception was realistic, and his thought processes were logical.  His thought processes were unremarkable.  He was not suicidal or homicidal.  (R. at 434-35.)  Plaintiff's diagnoses were bipolar disorder, most recent episode unspecified; and anxiety.  He was assigned a Global Assessment of Functioning ("GAF") score of 55.[2]  The intake registered nurse referred Plaintiff to see N.P. Lewis for medications.  Plaintiff declined other services.  (R. at 435.)

N.P. Lewis saw Plaintiff that same day for medication management.  Plaintiff reported depression and decreased energy and said that he had been self medicating with alcohol.  (R. at 437.)  N.P. Lewis observed that Plaintiff was fully oriented with an appropriate affect and noted that he was anxious and displayed a depressed mood.  She assessed his intellect as average.  Plaintiff reported a visual hallucination of a shadow off to the side and some paranoia that others are out to get him.  N.P. Lewis found his judgment to be good and his insight fair.  She

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  A GAF score of 51-60 is indicative of moderate symptoms or moderate difficulty any moderate difficulty in social, occupational, or school functioning.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33-34.

diagnosed bipolar disorder, anxiety, and "observation of other suspected mental condition." (R. at 439.) She prescribed Topamax and Trazodone. (*Id.*)

Plaintiff presented on April 19, 2013, with complaints of mood swings and anxiety. He stated that his symptoms were "fairly controlled," but that he had not been sleeping and had been awake for two days. (R. at 528.) He also reported some crying and sadness. On mental status examination, N.P. Lewis described Plaintiff's appearance as appropriate and noted that he was oriented to person, place, time, and situation. She noted that his behavior and psychomotor behaviors were unremarkable and that his speech and affect were appropriate. She described his mood as irritable and depressed. N.P. Lewis noted that Plaintiff's short-term memory was impaired. She described his attitude as cooperative and his reasoning, judgment, and insight as good. She noted that his thought processes were logical and that he did not express suicidal or homicidal ideation. (R. at 529.) She adjusted Plaintiff's medication. (R. at 529-30.)

On May 10, 2013, Plaintiff reported to N.P. Lewis that his symptoms were fairly controlled but that he stayed in the house a great deal. He further indicated that his mood had been controlled but that he had some days that he felt down. N.P. Lewis adjusted Plaintiff's medication. (R. at 531-33.)

On June 14, 2013, Plaintiff again reported to N.P. Lewis that his symptoms were controlled. He had maintained control of his anger. (R. at 537.) On mental status examination, N.P. Lewis observed that Plaintiff's mood was anxious and that his short-term memory was impaired. Plaintiff also reported auditory hallucinations. N.P. Lewis found that his thought content revealed paranoia. The remainder of his mental status examination was normal. (R. at 538.)

6

On July 12, 2013, Plaintiff again reported that his symptoms were controlled. He indicated that he had some anger and that he went outside and punched a flower pot. His sleep had increased. He asked to increase his Abilify prescription. (R. at 540.) N.P. Lewis noted Plaintiff was experiencing moderate improvement with his medication. (R. at 541.) His mental status examination was normal other than an anxious and irritable mood and thought content that revealed paranoia. (*Id.*)

When seen by a nurse, Julie Carpenter, on July 26, 2013, Plaintiff reported that he noticed no change and indicated that he was still depressed, but not suicidal. Nurse Carpenter noted that Plaintiff failed to follow the recommended dosage of his Abilify. On mental status examination, Plaintiff was cooperative, with normal speech, thought process and affect. Plaintiff's Wellbutrin was increased by N.P. Lewis. (R. at 499.)

On August 9, 2013, N.P. Lewis continued to note that Plaintiff was experiencing moderate improvement with his medication. His mental status examination was essentially normal with the exception of observed paranoia and an anxious and irritable mood. (R. at 544.)

On September 6, 2013, N.P. Lewis discussed addictions with Plaintiff and encouraged him to work with a sponsor. Plaintiff reported that his symptoms were fairly well controlled, but that he was sleeping a lot and experiencing some irritability. (R. at 546.)

On October 2, 2013, Plaintiff met with a nurse, Jo Copeland. On mental status examination, Nurse Copeland described Plaintiff as cooperative and observed that he had normal speech, no problem expressing himself, and displayed a normal thought process and affect. Nurse Copeland noted that, "client also participated in completion of disability forms forward to [N.P. Lewis] to review and cosign" (R. at 505). When seen by N.P. Lewis that same day,

7

Plaintiff reported that he had some depression, crying, and increased sleep.  (R. at 550.)  A Mental Residual Functional Capacity questionnaire signed by N.P. Lewis that same day indicates that Plaintiff is moderately impaired in every work-related ability.  (R. at 461-63.)  The form defined "Moderate" as "[u]nable to function in this area from 11% to 25% of the work day or work week."  (*Id.*)  She also checked a box on the form that indicated that Plaintiff was likely to have partial or full unscheduled absences from work occurring 5 or more days per month.

When seen on November 6, 2013, N.P. Lewis noted that Plaintiff's probation officer found amphetamines in his urine test.  Plaintiff indicated that he was more depressed and that his symptoms were increasing.  (R. at 554.)

When seen on January 29, 2014, for medication management, Plaintiff reported to Ms. Carpenter that he slept 12-14 hours a day before taking a nap in the afternoon.  He reported feeling depressed, but not suicidal.  He also reported occasionally hearing voices and having nightmares.  His mental status examination was normal.  N.P. Lewis stopped his Trazodone and started the medication Latuda.  (R. at 513.)

In July 2014, a telephone message indicated that Plaintiff had been arrested on persistent disorderly charge while intoxicated.  Plaintiff indicated that he had not consumed alcohol for some period of time, but that he had consumed too much on the day of his arrest.  He stated that he "had a bad day."  (R. at 517.)

In August 2014, Plaintiff told N.P. Lewis that he had started to drink again and had went to jail.  He reported feeling better the past few days.  (R. at 590.)  On mental status examination, N.P. Lewis observed that Plaintiff exhibited a euthymic mood, normal cognition, and normal insight with constricted affect.  (R. at 591.)  Plaintiff's GAF score remained at 55.  (R. at 592.)

**B.**    **David R. Bousquet, M.Ed.**

Plaintiff was evaluated for disability purposes by Mr. Bousquet on April 5, 2013.  (R. at

446-54.)  Plaintiff admitted using alcohol and drugs on a daily basis for two-to-four years, but he

denied use at the time of this evaluation.  (R. at 448.)  Plaintiff acknowledged a lengthy legal

history, stating "I've had too many charges to list."  (*Id.*)  He said he was fired from previous

jobs for failing to show up to work.  (*Id.*)  Plaintiff reported feeling depressed and easily annoyed

or angered.  (R. at 449.)  He lived in a house with his girlfriend and their children.  (R. at 450.)

He reported that he did nothing around the home and watched very little television.  (*Id.*)  He

did not have a driver's license as it was suspended for DUI, and he had not sought to have it

reinstated.  He reported that he had no hobbies and no visitors.  He also reported that his mother

came to see her grandchildren occasionally, but that he did not socialize with her when she came

to visit.  He did not visit others and did not belong to any groups or organizations and did not

attend church.  (*Id.*)  Mr. Bousquet noted that throughout this evaluation, Plaintiff struggled with

maintaining attention and concentration and was restless and fidgety.  (R. at 451.)

Mr. Bousquet diagnosed bipolar I disorder, anxiety disorder not otherwise specified,

alcohol abuse, and personality disorder not otherwise specified with dependent and avoidant

features.  (R. at 452.)  Mr. Bousquet assigned Plaintiff a GAF score of 50.  (*Id.*)  Mr. Bousquet

opined that Plaintiff would have some difficulties with his abilities to understand, remember, and

carry out instructions in the work setting; to maintain attention and concentration and also with

abilities to maintain an acceptable persistence and pace in a work setting; to conform to social

expectations in a work setting; and to respond appropriately to work place stresses and pressures.

(R. at 453-54.)

9

C.     **State-Agency Evaluations**

On April 12, 2013, upon review of Plaintiff's medical record, Janet Souder, Psy.D., a state-agency psychologist, assessed his mental condition and opined that he had moderate restrictions in his activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; with no episodes of decompensation of an extended duration.  (R. at 207.)  She further determined that the evidence did not establish the presence of the "C" criteria.  (R. at 208.)  Dr. Souder found Plaintiff's allegations were partially credible.  (R. at 208-09.)  She assigned partial weight to Mr. Bousquet's opinion, noting that he did not assess the degree of severity of limitations.  (R. at 209.)

In assessing Plaintiff's mental RFC, Dr. Souder opined that Plaintiff was moderately limited in his abilities to understand and remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance; be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers with out distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others.  (R. at 209-11.)  Dr. Souder found Plaintiff was markedly limited in his ability to interact appropriately with the general public.  (R. at 210.)  She concluded that Plaintiff retains the ability to understand and recall simple instructions in a workplace and to

complete simple tasks in a workplace, but required no strictly enforced pace/productivity expectations.  Due to psychological conditions and variable motivation and effort, Dr. Souder also found that Plaintiff may need occasional flexibility to schedule work tasks and rest breaks within a normal workday/workweek.  She next concluded that Plaintiff retains the ability to perform work activities that involve only superficial social contact with coworkers and supervisors.  Dr. Souder also opined that Plaintiff was best suited to nonpublic work due to his mood changes and personality disorder and that he retains the ability to perform static work duties.  She added that Plaintiff will need assistance with setting work goals and plans.  (R. at 209-11.)

In May 2013, Aracelis Rivera, Psy.D., reviewed the record upon reconsideration and essentially affirmed Dr. Souder's assessment.  (R. at 228-37.)

**D.     Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past jobs include a combination welder and a tack welder.  (R. at 196.)

The ALJ proposed a series of hypotheticals regarding an individual with Plaintiff's age, education, and work experience and the RFC he ultimately assessed.  The VE testified that such an individual could not perform Plaintiff's past work, but could perform approximately 2.1 million medium and light exertion, unskilled jobs in the national economy such as a kitchen helper, industrial cleaner, hand packager, marker, or a mail clerk.  (R. at 197-98.)

Upon cross-examination from Plaintiff's counsel, the VE testified that Plaintiff could not maintain competitive employment if off task up to twenty-five percent of the workday or workweek.  (R. at 199.)

## III.    THE ADMINISTRATIVE DECISION

On October 31, 2014, the ALJ issued his decision.  (R. at 155-68.)  At step one of the

sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since October 5, 2012, the alleged onset date of disability.  (R. at 160.)  The ALJ

found that Plaintiff had the severe impairments of major depressive disorder, not otherwise

specified; bipolar I disorder; anxiety disorder, not otherwise specified; personality disorder with

dependent and avoidant features; and a history of alcohol abuse.  (*Id.*)   He further found that

Plaintiff did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(R. at 161.)  At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that the claimant has
> the residual functional capacity to perform medium work as defined in 20 CFR
> 404.1567(c) and 416.967(c) with the following limitations: cannot climb ladders,
> ropes or scaffolds; should have no concentrated exposure to temperature extremes

---

[3]Social Security Regulations require ALJs to resolve a disability claim through a five-
step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a
dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d
727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five
questions:

 1.    Is the claimant engaged in substantial gainful activity?
 2.    Does the claimant suffer from one or more severe impairments?
 3.    Do the claimant's severe impairments, alone or in combination, meet or
       equal the criteria of an impairment set forth in the Commissioner's Listing of
       Impairments, 20 C.F.R. Subpart P, Appendix 1?
 4.    Considering the claimant's residual functional capacity, can the claimant
       perform his or her past relevant work?
 5.    Considering the claimant's age, education, past work experience, and residual
       functional capacity, can the claimant perform other work available in the national
       economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

12

or wet/humid conditions; and no exposure to hazards; should work in a low stress environment with no production line or assembly line type of pace, no independent decision-making responsibilities, and minimal changes in the daily work routine; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors.

(R. at 163.)  In reaching this determination, the ALJ accorded "great weight" to the opinions of the state-agency reviewing psychologists, Drs. Souder and Rivera, finding their opinions to be "well thought out [and] consistent with objective medical evidence of record" and also noting that "the reviewing consultants have an understanding of the disability programs and their evidentiary requirements."  (R. at 166.)  The ALJ assigned "some weight" to the report of consulting psychologist Mr. Bousquet, stating that "his report appears (though vaguely) to indicate moderate mental impairment."  (*Id.*)  The ALJ, however, accorded "little weight" to the portion of Mr. Bousquet's statement that the Plaintiff's self-report appeared reliable, explaining that "the other objective evidence of record does not support the claimant's reporting to be reliable."  (*Id.*)  As to N.P. Lewis, the ALJ noted her findings of moderate mental impairment, which he found to be "quite reliable and consistent with other objective medical evidence of record," but declined to afford "medical weight" to her opinion because she did not qualify as an acceptable medical source.  (*Id.*)

Relying on the VE's testimony, the ALJ concluded that even though Plaintiff cannot perform his past relevant work, he can perform jobs that exist in significant numbers in the national economy.  (R. at 165-66.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 168.)

## IV.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

**V.   ANALYSIS**

14

As set forth above, in his sole statement of error, Plaintiff challenges the ALJ's evaluation and weighing of the opinion of N.P. Lewis, asserting that the ALJ's errors deprived his decision of the support of substantial evidence. Although the ALJ arguably committed error in suggesting that the opinion could not be afforded medical weight, the Undersigned finds that any such error was harmless.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

Nurse practitioners like N.P. Lewis, however, are not "acceptable medical sources" and instead fall into the category of "other sources." 20 C.F.R. §§ 404.1513(d), 416.913(d). Although the ALJ must consider opinions from "other sources" and "generally should explain the weight given," . . . "other-source opinions are not entitled to any special deference." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) (citation omitted); *see also Cole v. Astrue*, 661 F.3d 931, 938 n.4 (6th Cir. 2011) (noting "the importance of addressing the opinion of a mental health counselor as a valid 'other source' providing ongoing care"). Social Security Ruling 06-03p, upon which Plaintiff relies, states as follows:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should

15

> explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-3p, 2006 WL 2329939, at *6.

Here, the ALJ's decision reflects that he considered the treatment notes of N.P. Lewis and also the questionnaire that Nurse Copeland and Plaintiff completed and N.P. Lewis later signed. (*See* R. at 163–674 (discussing Plaintiff's treatment at Southeast, Inc. and noting that his treatment notes reflect that his symptoms had been repeatedly reported to be fairly well controlled and that Plaintiff did not always comply with prescribed medications or show up for scheduled appointments); R. at 163–64 (noting that the mental residual functional capacity questionnaire N.P. Lewis signed reflected that Plaintiff had moderate impairment in all areas).) As set forth above, the ALJ concluded that N.P. Lewis' findings of moderate mental impairment were "quite reliable and consistent with other objective medical evidence of record." (R. at 166.) He nevertheless declined to accord any "medical weight" to the opinion because N.P. Lewis is not an acceptable medical source. (*Id*.)

As a threshold matter, the Undersigned agrees with Plaintiff, that the ALJ's assertion that N.P. Lewis' opinion was not entitled to weight because she is not an acceptable medical source is incorrect. *See* SSR 06-3p, 2006 WL 2329939, at *5 (indicating that under some circumstances, it may be appropriate to afford more weight to the opinion from a medical source who is not an acceptable medical source). But under the circumstances presented here, the Undersigned concludes that the ALJ's mistake is *de minimus* and harmless and that both his RFC and nondisability determinations are supported by substantial evidence.

16

As discussed above, what is important is that the ALJ "ensure[s] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id*. at *6.  The ALJ has done so here.  In particular, the ALJ made clear in his decision that he found that Plaintiff has moderate mental impairments, consistent with the findings of Mr. Bousquet, N.P. Lewis, and the state-agency medical consultants, whose opinions he assigned "great weight."  (R. at 162 ("After considering all evidence and testimony, the undersigned finds that in activities of daily living, [Plaintiff] has moderate restriction.  In social functioning, [Plaintiff] has moderate difficulties.  With regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties."); R. at 163 (noting Plaintiff's GAF rating at Southeast, Inc., which reflected moderate impairment); R. at 166 (according Mr. Bousquet's opinion "some weight" insofar as it indicates moderate mental impairment); *Id*. (assigning the opinions of the state-agency medical consultants—who opined that Plaintiff had moderate impairment in connection with their mental RFC assessment—"great weight").  Equally clear is that in using the word "moderate" to describe Plaintiff's level of impairment, the ALJ, like the state-agency consultants, defined the term as it is normally defined (*i.e.,* that a moderate limitation is not, of itself, work-preclusive).  *See Ziggas v. Colvin*, No. 1:13-cv-87, 2014 WL 1814019, at *6 (S.D. Ohio May 6, 2014) ("[C]ourts generally agree that although the Social Security regulations do not define a 'moderate limitation,' it is commonly defined on agency forms 'as meaning that the individual is still able to function satisfactorily.'" (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 888 (8th Cir. 2006)); *Cantrell v. McMahon*, 227 F. App'x 321, 322 (5th Cir. 2007) (upholding the use of following definition of "moderate": "there are some moderate limitations, but the

17

person can still perform the task satisfactorily").  The ALJ then incorporated the RFC limitations the state-agency consultants assessed in their opinions.  Because the ALJ's decision is supported by substantial evidence and allows Plaintiff and this Court to follow his reasoning, the Undersigned finds that the ALJ's incorrect statement concerning the whether an "other source" can be accorded medical weight is harmless.

Moreover, as the Commissioner points out, the ALJ's finding of moderate impairment is consistent with N.P. Lewis' opinion that Plaintiff was moderately impaired in his ability to perform sustained work activities, assuming that "moderately" is accorded its traditional definition in both instances.  This is an additional ground for concluding that the ALJ's incorrect statement was harmless.  *Cf. Cole*, 661 F.3d at 940 (failure to follow the good-reason rule that applies only to treating medical sources can be deemed to be harmless error if the Commissioner "'makes findings consistent with the opinion'" (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (same).

Plaintiff's arguments to the contrary are, in part, premised upon the fact that the form that Nurse Copeland and Plaintiff completed and that N.P. Lewis later signed failed to define "moderate" as it is normally defined (*i.e.,* that a moderate limitation is not, of itself, work-preclusive).  Despite the form providing boxes for the provider to rate the impairment level of particular abilities as "None," "Mild," "Moderate," "Marked," or "Extreme," nothing on the form even permits for a particular ability to be rated as moderate or mild in the traditional sense. (R. at 461.)  For example, even a rating of "mild" is defined as a complete inability to function for up to 10% of the workday or workweek.  (*Id*.)  And, as relevant here, a rating of "moderate"

18

is defined by the form as a complete inability to function up to 25% of the workday or workweek, which the VE testified would be work preclusive.  (R. at 461, 199.)

To the extent the form at issue is construed to reflect an opinion by N.P. Lewis that Plaintiff was unable to function up to 25% of the workday or workweek in nearly every work-related activity, the ALJ's failure to assign the opinion weight is harmless because the "opinion is so patently deficient that the Commissioner could not possibly credit it."  *Wilson*, 378 F.3d at 547 (holding that within the treating physician context, in which a heightened burden of articulation applies, an ALJ's failure to properly consider a treating physician's opinion is harmless where the opinion is "so patently deficient that the Commissioner could not possibly credit it").  First, as noted above, the form's unusual definitions do not even allow for rating the severity of a particular limitation in the traditional sense.  Second, the checkmarks—which were apparently not even made by N.P. Lewis—are conclusory in nature and fail to reflect whether these limitations exist when Plaintiff is sober and on his medications or whether these limitations would persist in light of certain accommodations such as those the ALJ incorporated in his RFC determination.  Third, there is a complete absence of any explanation or identification of objective criteria and documentation supporting the extreme opinion that Plaintiff was unable to function up to 25% of the workday or workweek in nearly every work-related activity.  Finally, such an opinion is inconsistent with and unsupported by other record evidence, including N.P. Lewis' own treatment notes, which reflect that Plaintiff's symptoms were fairly controlled with prescribed medication.  (*See* R. at 529-30, 531-33, 537-28, 540-41, 546, and 546.)  Thus, even applying the heightened harmless error standard that is applied only to opinions of acceptable treating sources, the ALJ's failure to assign weight to the form N.P. Lewis signed is harmless.

19

*See, e.g.*, *Hernandez v. Comm'r of Soc. Sec.*, No. 15-1875, --- F. A'ppx ----, 2016 WL 1055828, at *4 (6th Cir. Mar. 17, 2016) (finding ALJ's erroneous consideration of treating physician's opinion to be harmless error where the opinion consisted of a "check-box analysis . . . not accompanied by any explanation" and characterizing such an opinion as "weak evidence at best" that "meets our patently deficient standard" (internal quotation marks and citation omitted)); *Sharp v. Barnhart,* 152 F. A'ppx 503, 508 (6th Cir. 2005) (opinion of treating physician that claimant would be forced to miss ten out of every thirty days of week found to be "patently deficient" where the physician never explained why the claimant would have such limitations); *May v. Astrue*, No. 3:09-cv-090, 2009 WL 4716033 at *8 (S.D. Ohio Dec. 9, 2009) (finding opinion patently deficient where source simply checked boxes about the claimant's grasping ability and failed to provide supporting explanations or objective evidence).

In sum, the Undersigned agrees that the ALJ incorrectly stated that he could not assign weight to the opinion of N.P. Lewis because she was not an acceptable medical source.  The Undersigned finds, however, that this mistake is *de minimus* and harmless given that (1) substantial evidence supports his RFC determination and nondisability determination, and (2) his discussion of the evidence permits Plaintiff and this Court to follow the ALJ's reasoning for his decision.  Finally, even if this Court were to employ the heightened harmless error standards that apply only to opinions of acceptable treating sources, the ALJ's failure to assign weight to the check-the-box form N.P. Lewis signed is harmless.

## VI.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VII.    PROCEDURE ON OBJECTIONS

If Plaintiff seeks review by the District Judge of this Report and Recommendation, he may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

Plaintiff is specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**

Date: July 8, 2016            _____ /s/ *Elizabeth A. Preston Deavers* _____
                             ELIZABETH A. PRESTON DEAVERS
                             UNITED STATES MAGISTRATE JUDGE